



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ACADEMYONE, INC.,

    Plaintiff,

    v.

COLLEGESOURCE, INC.,

    Defendant.

FILED
DEC - 8 2008
MICHAEL E. KUNZ, Clerk
By____ Dep. Clerk

CIVIL ACTION

NO. _____ 08 5707

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff AcademyOne, Inc. brings this civil action against defendant CollegeSource, Inc. seeking legal and equitable relief and, in support thereof, avers as follows:

### THE PARTIES

1.    AcademyOne is a Pennsylvania corporation with a principal place of business at 601 Willowbrook Lane, West Chester, Pennsylvania 19382.

2.    CollegeSource is a California corporation with a principal place of business at 8090 Engineer Road, San Diego, California 92111.

### JURISDICTION AND VENUE

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338 and 1332. It also has jurisdiction because plaintiff is diverse from defendant, and the amount in controversy exceeds $75,000.

4.    Venue is proper in this Court under 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to the claims occurred in this district.

## FACTS

### AcademyOne Developed and Marketed a New Electronic Educational Information System

5.      AcademyOne provides an electronic system via the internet that allows college students and administrators to assess the equivalency of courses at different colleges and universities for purposes of transfer.

6.      AcademyOne's business focus is improving the efficiency and reducing the cost of the college transfer process for both students and educational institutions.  To do this, AcademyOne in mid-2005 developed a number of electronic systems.  The centerpieces of AcademyOne's business are the National Course Atlas, which provides a catalog of current course information at educational institutions across the country, and the Course Equivalency Management Center ("CEMC"), which provides an online means for comparing the academic equivalence of courses at different institutions.

7.      Other AcademyOne systems allow institutions to create and centralize transfer agreements and policies, assist counselors and advisors interacting with potential transferees, assess credit equivalency of courses between academic institutions and provide a means for students and institutions to easily access all available information.

8.      Upon information and belief, no such comprehensive national electronic system existed at the time AcademyOne developed its business plan and related products.

9.      On June 9, 2006, AcademyOne filed initial U.S. patent applications for its primary systems, the National Course Atlas and CEMC.

10.      Over the course of several months, between September 2006 and March 2007, AcademyOne began culling college and university course listings from thousands of

current college and university course catalogs or directly from institutions' websites to pre-load into its system.

11.    On November 1, 2006, AcademyOne registered www.collegetransfer.net as a domain name for hosting and offering its products and services over the internet.

12.    AcademyOne launched that site and www.courseatlas.com in March 2007.

13.    AcademyOne collected course descriptions for its database of current college catalogs in part by visiting approximately 4,000 colleges' and universities' websites. Many of these websites provided links to .pdf files of the institution's annual course catalog. Others provided course descriptions directly on their webpages.  AcademyOne uploaded the course descriptions to its database in batches.

14.    AcademyOne delivers its products to consumers via the internet.  It maintains a website accessible to any internet user.  Many of AcademyOne's student- and faculty-focused tools are available without charge, including the National Course Atlas.  The more advanced systems, such as the CEMC, are available only on a paid subscription basis. Subscribers are typically academic institutions and state higher education agencies. AcademyOne makes its money only from its subscribers, not from its student and faculty users who access the system for informational purposes.

15.    AcademyOne's patent applications for the CEMC and National Course Atlas were published by the U.S. Patent Office in December 2007.

### The Non-Profit Career Guidance Foundation

16.    In December 1971, the Career Guidance Foundation ("CGF") incorporated as a not-for-profit entity in Delaware under the name Educational Information Services, Inc.  CGF's stated goal was to develop nationally coordinated education information systems.

17.     CGF's certificate of incorporation prohibited the organization's property or assets from going to any for-profit entity upon dissolution.

18.     In 1980, then officially named CGF, the foundation set up a principal place of business in California.

19.     From its founding, CGF's primary activity involved collecting and archiving course catalogs and descriptions from colleges and universities for institutional and student use.  CGF did not write any of the course descriptions in its course library.

20.     Beginning in 1996, CGF put college and university course materials online.

### CGF Dissolved and Transferred Its Assets to For-Profit CollegeSource, Inc.

21.     In March 2001, the Internal Revenue Service notified CGF that it was revoking its tax-exempt status, retroactive to 1996, due to activities that generated profit for CGF officers.  CGF challenged the revocation through a declaratory judgment action.

22.     In 2004, while the declaratory judgment action was pending, CGF began preparing to dissolve and reconstitute as a for-profit entity.  The California Attorney General approved a plan by CGF to transfer its assets to the non-profit San Diego Community Foundation, which would then sell the assets, based on an independent appraisal, to a for-profit entity owned by CGF's director, Harry Cooper.

23.     Career Guidance, Inc., which later changed its name to CollegeSource, Inc., incorporated as a for-profit entity in California in March 2004.

24.     Between June and August 2004, CGF terminated its business and wound up its operations.  Specifically, it dissolved as a corporation in Delaware and revoked its foreign corporation standing in California.

## CGF Never Transferred Copyrights to CollegeSource

25.      In May 2004, during the transfer process, CollegeSource purchased CGF's trademark rights.  Upon information and belief, neither CollegeSource nor Career Guidance, Inc. bought any copyrights or copyrighted material from CGF.

26.      Shortly thereafter, CGF transferred all of its assets to the San Diego Community Foundation.  The enumerated list of assets, based on a December 2002 appraisal by CGF's own accounting firm -- not an independent accountant -- included only tangible assets. The list did not include any copyrights, and, upon information and belief, no copyrights were transferred.

27.      Upon information and belief, CollegeSource immediately purchased all of the assets that the San Diego Community Foundation purchased from CGF, but did not buy any copyrights or other intangibles.

## CollegeSource Began Operating as the Purported Successor of CGF and Continues to Use CGF's Entity Status

28.      CollegeSource has been operating since 2004 as the purported successor of CGF.  It claims to have existed since 1971, even though CGF dissolved in 2004.

29.      CollegeSource's business consists of maintaining and updating a library of .pdf college and university course catalogs and, most recently, providing online transfer evaluation systems for institutions.  The former area is a continuation of CGF's operations.

30.      CollegeSource has improperly placed copyright registration notices on materials from CGF, which it makes publicly available.  Also, CollegeSource improperly maintains CGF's copyright notices on other publicly available materials.

31.      CollegeSource purports to assert CGF's rights in the terms of use it posts on its website and in course catalogs, stating that certain actions cannot be taken "without the

express written consent of CollegeSource ® and Career Guidance Foundation" and that "CollegeSource ® and Career Guidance Foundation reserves [sic] the right to revoke such authorization at any time, and any such use shall be discontinued immediately upon written notice from CollegeSource ® and Career Guidance Foundation."

32.    Upon information and belief, CollegeSource misleadingly used CGF's name after its dissolution as a conduit for receiving money:

a.    Three educational institutions in Tennessee paid CGF a total of $6,830 for access to CollegeSource products in 2007 and 2008.

b.    CGF received a payment of $1,213.00 in late 2006 from the College of the Sequoias Community College District.

c.    The Dallas Community College District planned to pay CGF $11,330 on a service contract as of August 2006.

33.    CollegeSource maintains the websites cgf.org, collegesource.org and tes.collegesource.org using a domain name extension reserved for not-for-profit entities.  The two collegesource.org websites were originally registered by CGF in 1997, then re-registered by CGF in 2007, three years after CGF's dissolution.  CGF registered the cgf.org website in 1995. Cgf.org was re-registered in 2008 by CollegeSource, four years after CGF's dissolution.

34.    On October 27, 2008, CollegeSource filed a complaint in a California court improperly casting itself as the successor in interest to CGF.

35.    CollegeSource charges a fee for access to most items in its course library, which users access primarily over the internet.

### College Source Developed TES to Compete with CEMC

36.     Upon information and belief, CollegeSource began developing TES, its transfer evaluation system, in 2005.  Also upon information and belief, CollegeSource Chief Executive Officer Kerry Cooper became aware of TES's limitations when she attended a "webinar" hosted by AcademyOne that allowed her to view the basic aspects of CEMC, and, most significantly, AcademyOne's marketing strategies for its products.

37.     Upon information and belief, in April 2007, CollegeSource formally launched its TES Transfer Evaluation product and began to directly compete with CEMC. Before developing TES, CollegeSource did not directly compete with AcademyOne.

38.     CollegeSource charges a fee for the use of TES and provides access to TES via the internet.

### CollegeSource Registered a Domain Name Nearly Identical to AcademyOne's

39.     On October 8, 2007, CollegeSource purchased the www.collegetransfer.com domain name and set it to link directly to its homepage, www.collegesource.com.  With the exception of the extension, the domain name is identical to AcademyOne's website, www.collegetransfer.net, which is widely recognized by prospective transfer students.

40.     Upon information and belief, prior registration of the www.collegetransfer.com domain name by a different registrant dating from 2002 served as a placeholder, and the website had no content.

41.     Currently, CollegeSource's website features its TES application and advertises the ability to "Evaluate Coursework," "Manage Equivalencies" and "Improve Transfer!"

42.     CollegeSource's use of www.collegetransfer.com is likely to cause confusion in the marketplace about source and origin of its goods and services.  The average internet user who visits www.collegetransfer.com is likely to be unaware that the products it finds on that website are not supplied by AcademyOne, as they are at www.collegetransfer.net. This likelihood of confusion has caused and is causing harm to AcademyOne.

## CollegeSource Alleged Copyright Infringement

43.     In the spring of 2007, Kerry Cooper requested a meeting with AcademyOne Chief Executive Officer David Moldoff.  At that meeting, Cooper gave Moldoff a letter alleging copyright infringement.  The letter demanded removal of material from AcademyOne's website, a public apology and damages.  Specifically, it referenced 700 .pdf files out of 18,000 that AcademyOne had posted on its website just one week prior, and claimed that the disputed .pdfs contained CollegeSource's and CGF's embedded copyright notices.

44.     AcademyOne collected information for its database of current college catalogs in part by visiting approximately 4,000 colleges' and universities' websites, not by visiting CollegeSource's library.  Many of these websites provided links to .pdf files of the institution's annual course catalog.  AcademyOne clicked on these links from college and university websites to gather catalogs for its course database.  Unbeknownst to AcademyOne, links from some of these websites automatically accessed .pdf files supposedly located on CollegeSource's server.  Some may have even been on the college or university website servers. AcademyOne also obtained much of its data directly from educational institutions.

45.     Within several hours of Moldoff's meeting with Cooper, AcademyOne removed all of the .pdf files, but did not admit or agree that CollegeSource had rights in them. AcademyOne did not retain any copies of the files on its servers.  AcademyOne does not possess other files, either on its computers or website, digitized by CollegeSource.

46.     On May 4, 2007, Cooper sent Moldoff another letter demanding removal of all course descriptions and a public statement to all AcademyOne users that the .pdf files and other data on its website were property of CollegeSource obtained without permission. Moldoff rejected these demands.

47.     Although AcademyOne did not infringe on any copyrights, it re-collected course descriptions from institution websites and used the newly collected data to replaced prior versions.

### South Carolina Awarded AcademyOne a Contract

48.     On May 29, 2008, AcademyOne and CollegeSource both submitted bids to the South Carolina Commission for Higher Education.

49.     South Carolina announced its intent to award a contract to AcademyOne on June 25, 2008.

50.     CollegeSource filed a protest of South Carolina's decision on July 7, 2008, citing AcademyOne's "use[], without permission, [of] the intellectual property of its competitors" as one basis for challenging the contract. CollegeSource sought elimination of AcademyOne's offer and the award of the contract to the next highest scorer, or the institution of a new bidding process. On November 14, 2008, CollegeSource informed AcademyOne that it would not pursue an intellectual property claim as one of the bases to challenge the contract award.

51.     On August 25, 2008, the South Carolina Chief Procurement Officer denied CollegeSource's protest.

52.     CollegeSource filed an appeal of the denial on September 4, 2008.

53.     An Administrative Review Panel hearing is scheduled for the week of December 8, 2008.  This Panel will hear CollegeSource's appeal and issue the final decision in the contract award, anticipated within thirty days of the hearing.

## COUNT I - FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)

54.     AcademyOne incorporates the allegations of paragraph 1 through 53, inclusive, of this Complaint as though the same were fully set forth herein.

55.     CollegeSource misrepresents on its website and on its course catalog files that it holds a copyright in college and university catalog materials obtained from CGF. CollegeSource has been making such statements on its materials since its incorporation in 2004 and continues to do so through the present.

56.     CollegeSource uses its website and its course materials for advertising and promotional purposes for its products.

57.     CollegeSource's copyright notices and claims had the tendency to deceive a substantial segment of those who viewed them.

58.     CollegeSource charges a fee for the use of its products.  Such a fee is premised on CollegeSource's alleged exclusive rights in the materials.

59.     CollegeSource's claim of exclusive rights to the course library materials is likely to influence a purchasing decision and is therefore material.

60.     CollegeSource operates nationally and on the internet and thus has caused its false statements to enter interstate commerce.

61.     CollegeSource's conduct is likely to and did confuse, mislead, or deceive customers or potential customers, and constitutes false advertising, in violation of 15 U.S.C.A. § 1125(a).

62.     AcademyOne has been injured because, in an attempt to avoid a loss of goodwill associated with CollegeSource's false statements, AcademyOne underwent an expense and lost business time in redoing its data collection for allegedly infringing copyrighted works.

63.     CollegeSource nonetheless improperly continues to lay public claim to copyrights it does not own in college course catalog materials, portions of which AcademyOne does or may use.

64.     CollegeSource also continues to assert CGF's misleading claims of copyright ownership beyond the scope of data compilation.

65.     CollegeSource's conduct is willful and malicious.

66.     Damages alone do not adequately remedy the ongoing harm caused to AcademyOne by CollegeSource's false advertising.

WHEREFORE, plaintiff AcademyOne, Inc. respectfully requests that this Court:

a.     Enjoin CollegeSource and its agents, servants, representatives, officers, directors, employees, affiliates and all persons acting in concert with them, directly or indirectly, from making further false statements of copyright ownership, pursuant to 15 U.S.C. § 1125(a);

b.     Enjoin CollegeSource and its agents, servants, representatives, officers, directors, employees, affiliates and all persons acting in concert with them, directly or indirectly, from making further false statements of affiliation with CGF, pursuant to 15 U.S.C. § 1125(a);

c.     Award AcademyOne monetary damages, pursuant to 15 U.S.C. § 1117;

d.     Award AcademyOne exemplary damages and attorneys fees;

   e.  Grant AcademyOne such other relief as is just and proper.

## COUNT II - TRADEMARK INFRINGEMENT AND FALSE DESIGNATION
## PURSUANT TO 15 U.S.C. § 1125(a)

   67.  AcademyOne incorporates the allegations of paragraph 1 through 66, inclusive, of this Complaint as though the same were fully set forth herein.

   68.  AcademyOne chose the domain name to correspond with the nature of its products.

   69.  AcademyOne's www.collegestransfer.net has become distinctive by acquiring a secondary meaning of association with AcademyOne's products and services.

   70.  CollegeSource registered www.collegetransfer.com on October 8, 2007.

   71.  CollegeSource's website differs from AcademyOne's only in the domain extension.

   72.  CollegeSource provided that the website www.collegetransfer.com would immediately link back to its own website.

   73.  CollegeSource's website www.collegetransfer.com is likely to cause confusion in the marketplace with AcademyOne's previously registered www.collegetransfer.net.

   74.  CollegeSource's actions were willful and malicious.

   75.  Damages alone do not adequately remedy the ongoing harm caused to AcademyOne by CollegeSource's dilution.

  WHEREFORE, plaintiff AcademyOne, Inc. respectfully requests that this Court:

   a.  Enjoin CollegeSource and its agents, servants, representatives, officers, directors, employees, affiliates and all persons acting in concert with them, directly or indirectly, from using the domain name www.collegetransfer.com and to order

CollegeSource to transfer ownership of the domain name to AcademyOne, pursuant to 15 U.S.C. § 1125(a);

    b.  Award AcademyOne damages;

    c.  Grant AcademyOne such other relief as is just and proper.

## COUNT III - CYBER-SQUATTING UNDER 15 U.S.C. § 1125(d)

   76.  AcademyOne incorporates the allegations of paragraph 1 through 75, inclusive, of this Complaint as though the same were fully set forth herein.

   77.  CollegeSource registered www.collegetransfer.com in bad faith.

   78.  CollegeSource had launched a product in competition with AcademyOne's at the time of its domain registration.

   79.  CollegeSource's purpose in registering the domain name was to draw business from AcademyOne's website.

   80.  Damages alone do not adequately remedy the ongoing harm caused to AcademyOne by CollegeSource's cyber-squatting.

   81.  CollegeSource's conduct was willful and malicious.

WHEREFORE, plaintiff AcademyOne, Inc. respectfully requests that this Court:

    a.  Enjoin CollegeSource and its agents, servants, representatives, officers, directors, employees, affiliates and all persons acting in concert with them, directly or indirectly, from using the domain name www.collegetransfer.com and to order CollegeSource to transfer ownership of the domain name to AcademyOne, pursuant to 15 U.S.C. § 1125(d);

    b.  Award AcademyOne monetary damages, pursuant to 15 U.S.C. § 1117;

c.       Award AcademyOne exemplary damages and attorneys fees;

d.       Grant AcademyOne such other relief as is just and proper.

Respectfully submitted,

David E. Landau
Aliza R. Karetnick
WolfBlock LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103
(215) 977-2052

Attorneys for Plaintiff, AcademyOne, Inc.

Dated:  December 8, 2008