IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ACADEMYONE, INC.              :        CIVIL ACTION
                              :
        v.                    :
                              :
COLLEGESOURCE, INC.           :        NO.  08-5707

## MEMORANDUM

**Padova, J.**                                    **December 21, 2009**

This is a Lanham Act/Anti-Cybersquatting Consumer Protection Act case involving two

companies that both provide college transfer services over the Internet, Plaintiff AcademyOne, Inc.

("AcademyOne") and Defendant CollegeSource, Inc. ("CollegeSource").  AcademyOne asserts three

claims against CollegeSource: false advertising, trademark infringement, and cybersquatting.

CollegeSource has filed a Motion for Summary Judgment, seeking judgment in its favor on all three

of the claims.  For the following reasons, we grant CollegeSource's Motion and enter judgment in

CollegeSource's favor.

## I.      BACKGROUND

AcademyOne was founded in 2005.  In the middle of that year, it developed two electronic

systems:  (1) the "National Course Atlas, which provides a catalog of current course information at

educational institutions across the country," and (2) the "Course Equivalency Management Center

('CEMC'), which provides an online means for comparing the academic equivalence of courses at

different institutions." (See Moldoff Decl. ¶¶ 2, 5.)  On November 1, 2006, AcademyOne registered

www.collegetransfer.net as a domain name for hosting and offering its products and services over

the internet, and it launched that site as well as www.courseatlas.com in March of 2007.  (Id. ¶¶ 12,

20.)  Together, these systems and websites provide an "Internet-based electronic system that allows

college students and administrators to assess the equivalency of courses at different colleges and

universities for purposes of transfer." (Id. ¶ 2.) As AcademyOne explains, its "business focus is on improving the efficiency and reducing the cost of the transfer process for both college students and educational institutions." (Id. ¶ 3.)

In December 1971, long before AcademyOne's creation, Career Guidance Foundation ("CGF") was incorporated as a not-for profit entity. (See Karetnick Decl. Ex. A.) CGF collected and archived course catalogs from colleges and universities, put them on microfiche, and offered them to paying subscribers. (See Cooper Dep. at 9-10.) In or about 1992, CGF moved its course catalog content to a CD Rom format and, in 1994 or 1995, it again moved the material, this time onto a web-based system. (Ybarra Dep. at 10-12.) In 1994, it obtained copyrights in its digitized versions of the course catalog materials. (See Moldoff Decl. Ex. S.)

In March 2001, the IRS notified CGF that it was revoking its tax exempt status retroactive to 1996 because CGF had generated profit for its officers. (See Karetnick Decl. Ex. H.) Thereafter, CGF challenged the revocation through a declaratory judgment action but, at the same time, prepared to dissolve and reconstitute as a for-profit entity. (See Karetnick Decl. Ex. K; Separate Statement of Mat. Facts in Supp. of CollegeSource Mot. for Summ. Judg. ("SSMF") ¶ 13; AcademyOne's Resp. to CollegeSource Statement ("Resp. to SSMF") ¶ 13.) )

To that end, CGF made plans to transfer its assets to the non-profit San Diego Community Foundation ("SDF"), which would then sell the assets to a for-profit entity owned by CGF's director, i.e., CollegeSource. In May 2004, CGF president Ralph Anders and SDF president/CEO Robert Kelly signed a Donor Agreement, pursuant to which CGF assigned and transferred to SDF "all of its right, title, and interest in and to any and all of the properties and assets of [CGF], both real and personal, tangible and intangible, of every kind and nature." (Anders Decl. ¶¶ 4-5 and Ex. A; Kelly

Decl. ¶¶ 3-4.)  Immediately thereafter, Anders, now on behalf of CollegeSource, and Kelly signed an Asset Purchase Agreement pursuant to which SDF sold to CollegeSource "all right, title, and interest in and to the properties and assets donated and transferred to [SDF] by [CGF] under the Donor Agreement."  (Anders Decl. ¶¶ 6-7 and Ex. B.; Kelly Decl. ¶¶ 5-6.)  In that regard, the Purchase Agreement specified as follows:

> [T]he Buyer and the Seller agree as follows:
>
> **1.  Purchase and Sale.**
>
>> **1.1  Acquired Assets**. . . . [T]he Seller shall sell, assign, transfer, and deliver to the Buyer, and the Buyer shall purchase, acquire, and take transfer, assignment and delivery of, all right, title, and interest in and to the properties and assets donated and transferred to the Seller by the Donor under the Donor Agreement (collectively the "Acquired Assets"), which shall include, without limitation, the following properties and assets:
>>
>> \*   \*   \*
>>
>>> (h) Intangibles: . . . all trademarks, service marks, trade names, corporate names, copyrights, designs, patents, licenses, and applications . . . and other intangible assets . . . .

(Anders Decl. Ex. B.)  CollegeSource has since maintained and updated the library of college and university course catalogs in .pdf format that originally belonged to CGF.  It places the following copyright information on its materials:

> Copyrights 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005.
> College Source, Inc. and Career Guidance Foundation.
>
> CollegeSource digital catalogs are derivative works owned and copyrighted by CollegeSource, Inc. and Career Guidance Foundation.

Catalog content is owned and copyrighted by the appropriate school.

While College Source, Inc. and Career Guidance Foundation provides information as a service to the public, copyright is retained on all digital catalogs.

> **This means you may NOT:**

- distribute the digital catalog files to others,
- "mirror" or include this material on an Internet (or Intranet) server, or
- modify or re-use digital files

without the express written consent of CollegeSource, Inc. and Career Guidance Foundation and the appropriate school.

> **You may:**

- print copies of the information for your own personal use,
- store the files on your own computer for personal use only, or
- reference this material from your own documents.

(Moldoff Decl. Ex. S)

In March of 2006, CollegeSource debuted and launched a transfer evaluation system ("TES"), similar to AcademyOne's CEMC, which utilizes course descriptions from its college catalog databases. (Cooper Dep. at 21, 24.) In July 2007, CollegeSource purchased the domain name www.collegetransfer.com from an internet domain name re-seller. (See Karetnick Decl. Ex. X.) Its intent in purchasing that domain name was to direct traffic to www.collegesource.com. (See Holaday Dep. at 49.) Around the same time, CollegeSource also registered the following additional domain names: www.collegetransfers.info, www.collegetransfer.info, www.collegetransfers.net, and www.collegetransfers.org. (See Ybarra Dep. at 31, 33; Karetnick Decl. Ex. Y.) It is undisputed that CollegeSource's "registration and use" of www.collegetransfer.com began on October 8, 2007. (See SSMF ¶ 128; Resp. to SSMF ¶ 128.)

The Complaint in this case, which AcademyOne filed on December 8, 2008, asserts two claims under the Lanham Act and one under the Anti-Cybersquatting Consumer Protection Act ("ACPA"). Count One asserts a claim of false advertising under the Lanham Act, 15 U.S.C. § 1125(a), based on CollegeSource's alleged misrepresentations that it holds copyrights to course catalog materials and that it is affiliated with CGF, a nonprofit. Count Two asserts a claim of trademark infringement and false designation under the Lanham Act, 15 U.S.C. § 1125(a), based on CollegeSource's registration and use of www.collegetransfer.com. Count Three asserts a claim of cybersquatting under the ACPA, 15 U.S.C. § 1125(d), based on CollegeSource's alleged bad faith registration of www.collegetransfer.com in conjunction with the launching of a product in competition with AcademyOne's.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

"[A] party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion, and identifying those portions of the [record] that it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court

that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response "must – by affidavits or otherwise as provided in this rule – set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "In evaluating the evidence, we take the facts in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in its favor." Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003) (quotation omitted). "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 407 (E.D. Pa. 2000). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. AEV, Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

## III.    DISCUSSION

### A.    Count I – False Advertising

As explained above, Count I of the Complaint asserts that CollegeSource falsely advertised that it held copyrights to course catalog material that it obtained from CGF.[1]  As the undisputed

---

[1]In its Complaint, AcademyOne also suggested that CollegeSource had falsely advertised that it was affiliated with CGF. (Complaint ¶ 66(b)). However, it makes clear in its brief that its false advertising claim is "narrowly focused on CollegeSource's false statement regarding assets purportedly conveyed to SDF and then to CollegeSource as part of the [CGF-SDF-CollegeSource] Transaction." (AcademyOne's Opposition to CollegeSource's Comprehensive Br. ("AcademyOne Compr. Br.") at 29.) Thus, it has abandoned any claim that CollegeSource falsely advertised that it was affiliated with CGF.

record evidence establishes that CollegeSource did hold copyrights to the course catalog material at issue, having obtained the copyrights from CGF, we enter judgment in favor of CollegeSource on this claim.

The cause of action for false advertising is set forth in § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides in pertinent part as follows:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce . . . . any false or misleading description of fact, or false or misleading representation of fact, which –
>
> \* \* \*
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). To establish a violation of this provision, "[t]he plaintiff must prove that the

---

We also conclude that AcademyOne's claim is limited to false advertising of copyright ownership. AcademyOne rephrased its claim both in its comprehensive brief and at oral argument, suggesting that it was one for false advertisement of course catalog database ownership, rather than merely copyright ownership. (See, e.g., AcademyOne Compr. Br. at 29; N.T. 11/5/09 at 12-13.) However, the Complaint clearly asserts a claim for false advertisement of copyright ownership. (See Complaint ¶¶ 55, 57, 63, 64, 66a ("CollegeSource misrepresents . . . that it holds a copyright in . . . catalog materials"; "CollegeSource's copyright notices and claims had the tendency to deceive"; CollegeSource "lay[s] public claim to copyrights it does not own"; CollegeSource "continues to assert CGF's misleading claims of copyright ownership"; requesting that Court "[e]njoin CollegeSource . . . from making further false statements of copyright ownership").) Moreover, in its response to an interrogatory seeking all facts in support of its false advertising claim, AcademyOne did not mention course catalog database ownership, focusing instead on its allegations that "CollegeSource has placed copyright registration notices on materials from CGF . . . though it does not appear to have purchased CGF's copyrigths [sic]." (Quinn Decl. Ex. A at 2.) Accordingly, we consider Count I as asserting only a claim for false advertising of ownership of copyrights.

commercial message is either literally false or, if not literally false, literally true or ambiguous with the tendency to deceive consumers." Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 136 (3d Cir. 2005) (citing Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002)). A "plaintiff need not prove the challenged advertising misled the public if he can show it was literally false." Facenda v. N.F.L. Films, Inc, 542 F.3d 1007, 1021 (3d Cir. 2008) (quoting Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 n.8 (3d Cir. 1994)).

In this case, AcademyOne claims that CollegeSource's advertising was literally false, asserting that CollegeSource advertised that it held copyrights to the course catalog material that it maintains on its website when it does not, in fact, own those copyrights. In its Motion for Summary Judgment, CollegeSource argues, among other things, that the undisputed facts of record establish that it acquired the copyrights from CGF pursuant to the 2004 Donor Agreement and accompanying Asset Purchase Agreement and, thus, its statements that it holds the copyrights at issue are not false. CollegeSource therefore argues that AcademyOne cannot prevail on a claim for false advertising, and judgment should be entered in CollegeSource's favor on that claim.

In considering the effect of the Donor Agreement and Asset Purchase Agreement, we are guided by the principle that "[w]hen a writing is clear and unequivocal, its meaning must be determined by its contents alone." Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008) (applying Pennsylvania law); County of San Diego v. Ace Property & Cas. Ins. Co., 118 P.3d 607, 612 (Cal. 2005) ("If contractual language is clear and explicit, it governs.") (citations

omitted).[2]  Moreover, "[t]he requirements for a valid transfer of copyright ownership are simple: a transfer document must be in writing and signed and it must be clear." Bieg v. Hovnanian Enters., Inc., 157 F. Supp. 2d 475, 483 (E.D. Pa. 2001); Copyright Act, 17 U.S.C. § 204(a) ("[A] transfer of copyright ownership . . . is not valid unless an instrument of conveyance . . . is in writing and signed by the owner or such owner's . . . agent").  Notably, a "document does not need to include the word 'copyright' in order to constitute a valid transfer document." Bieg, 157 F. Supp.2d at 480 (citations omitted).  Thus, where an agreement "leaves little doubt" that the original copyright owner sold all of its assets "tangible and intangible alike," it need not mention the word "copyright" in order to effectuate a valid transfer. Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 413 (7th Cir. 1992) (cited with approval in Bieg, 157 F. Supp. 2d at 480).

In this case, CGF was the undisputed original owner of the copyrights at issue in 2004.  That year, it entered into the Donor Agreement, which transferred from CGF to SDF "all right, title, and interest in and to any and all of the properties and assets of [CGF], both real and personal, tangible and intangible, of every kind and nature."  (Anders Decl. Ex. A (emphasis added)).  SDF and CollegeSource then entered into the Asset Purchase Agreement, which, in turn, transferred "all right, title, and interest in and to the properties and assets donated and transferred to the [SDF] by [CGF]," including, but not limited to, "all . . . copyrights."  (Anders Decl., Ex. B ¶ 1.1(h) (emphasis added)).

---

[2]CollegeSource primarily cites Pennsylvania law concerning interpretation of the agreements at issue.  (CollegeSource Comprehensive Br. in Supp. of Mot. for Summ. Judg. ("CollegeSource Compr. Br.") at 11-14.)  Nevertheless, it suggests in a footnote that California law should apply because both contracts were executed in California and the Purchase Agreement has a choice-of-law provision specifying that California law applies.  (Id. at 14 n.11.)  Meanwhile, AcademyOne does not cite any law in response to CollegeSource's contract interpretation argument, much less take a position as to which law is controlling.  (AcademyOne Compr. Br. at 35-36.)  As a result, we will consider both Pennsylvania and California law.

Under the clear and unequivocal terms of these agreements, all of CGF's tangible and intangible assets, including all copyrights, were transferred via SDF to CollegeSource.

AcademyOne nevertheless argues that, because the Lanham Act has equitable roots and is based on broad equitable principles, it should be permitted to introduce extrinsic evidence that shows that the Donor and Asset Purchase Agreements did not, in fact, transfer any intellectual property rights. Moreover, it maintains that the record evidence creates a genuine issue of material fact as to whether the Donor and Asset Purchase transactions actually transferred CGF's copyrights to CollegeSource. It specifically relies on the following evidence: (1) an IRS Form 990 that was signed by CGF's founder, Harry Cooper, and does not list any copyrights as assets that were transferred to SDF (see Karetnick Decl. Ex. BB); (2) CGF documents that indicate that CGF hired the accounting firm of Peterson & Co. to determine the fair market value of the company's assets prior to the company's entry into the Donor Agreement (see Karetnick Decl. Exs. W.6 and EE); (3) the resulting appraisal, which does not explicitly mention intangible assets (see Karetnick Decl. Ex. U.); and (4) an expert report, which opines that the appraisal did not include the intangible assets and intellectual property. (See Economou Rpt. at 5.)[3]

If Pennsylvania law applies to the interpretation of these Agreements, see n.2 supra, we are not permitted to consider this evidence and must find that the plain language of the contracts is determinative of the parties' intent, i.e., to transfer the copyrights. See Great Am. Ins. Co., 544 F.3d at 243 ("Only where a contract's language is ambiguous may extrinsic or parol evidence be

---

[3]CollegeSource has filed a Daubert motion, seeking to exclude the testimony of Mr. Economou. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). We need not resolve this motion, however, because, even considering Mr. Economou's report, we grant summary judgment in CollegeSource's favor.

considered to determine the intent of the parties."). On the other hand, if California law applies, we must consider the proffered extrinsic evidence to determine, as a matter of law, whether the otherwise unambiguous contractual language is reasonably susceptible to the contrary interpretation urged by AcademyOne. See Halicki Films, LLC v. Sanderson Sales & Marketing, 547 F.3d 1213, 1223 (9th Cir. 2008)(citations omitted). In the end, of course, even applying California law, the essential purpose of considering the extrinsic evidence is to ascertain the intent of the contracting parties. See Fru-Con Const. Corp. v. Sacramento Mun. Util. Dist., No. Civ. S-05-583, 2008 WL 877970, at *11 (E.D. Cal. Mar. 28, 2008) ("A court may turn to extrinsic evidence to construe the contract, if the evidence shows the intent of the contracting parties and offers a meaning to which the contract is reasonably susceptible.") (citing Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., Inc., 442 P.2d 641 (Cal. 1968)).

Assuming *arguendo* that California law applies, and considering the extrinsic evidence, we conclude that the Agreements are not reasonably susceptible to the interpretation urged by AcademyOne, i.e., that no copyrights were transferred in the Agreements. Even if we consider the extrinsic evidence, it is clear that the contracting parties intended to transfer the copyrights. Most notably, CollegeSource has submitted Declarations of CGF President (and later CollegeSource President) Ralph Anders and SDF President/CEO Robert Kelly, the two signatories to the Agreements, who both unequivocally state that their intentions were to transfer the copyrights. (See Anders Decl. ¶ 8 ("[T]he Donor Agreement and the Purchase Agreement were, when taken together, intended to transfer all 'tangible and intangible' assets of [CGF] 'of every kind and nature' to . . . CollegeSource . . . , including, but not limited to all of [CGF's] copyrights and copyrighted materials."); Kelly Decl. ¶ 7 (same).) These stated intentions, in conjunction with the plain language

of the Agreements, are certainly sufficient to foreclose any alternative interpretation of the parties' intent with respect to the copyrights.[4]

Moreover, the evidence on which AcademyOne relies in attempting to prove that the parties did not intend to transfer the copyrights is patently inadequate. AcademyOne primarily points to an IRS Form 990 that Harry Cooper, the CFO of CGF filed with the IRS in January 2006. AcademyOne emphasizes that the Form 990 included an extensive list of assets that CGF transferred to SDF, which did not include the copyrights, and argues that the Form 990 therefore creates a genuine issue of material fact as to whether the copyrights were transferred. (See Karetnick Decl Ex. BB at ACA-P00000055-58.) However, contrary to AcademyOne's suggestion, the IRS Form 990, which is not an operative transfer document, and was not filed until eight months after the transaction was concluded, simply does not create a genuine issue as to the parties' intent, which is clearly expressed in the transfer documents and the Anders and Kelly Declarations. Indeed, while the Form 990 does not explicitly list the copyright in the list of assets, it does clearly state that CGF "dissolved as of May 14, 2004 and distributed all assets to [SDF]" (id. at ACA-PA00000062 (emphasis added)), and further shows that CGF's net assets after the distribution were valued at "0." (Id. at ACA-PA00000032). Thus, the Form 990 as a whole is not inconsistent with the parties' stated intent.

_____

[4]Relying on these same Declarations, CollegeSource also asserts that AcademyOne does not have standing to contest the assignment of the copyrights, citing cases in which courts have stated that a third party does not have standing to question a copyright transfer under § 204 of the Copyright Act when an otherwise valid copyright has been transferred and the parties to the transfer do not dispute the transfer's effectiveness. (See CollegeSource Compr. Br. at 14-15 (citing, e.g., Basketball Mktg. Co. v. Steve & Barry's Univ. Sportswear, Civ. A. No. 07-716, 2008 WL 5586141, at *1 n.1 (E.D. Pa. June 30, 2008)). AcademyOne argues that the cases on which CollegeSource relies involved challenges by alleged infringers and cannot be applied to deprive a competitor-plaintiff from challenging a transfer in the context of a Lanham Act claim. We need not resolve this dispute in light of our conclusion that the undisputed facts establish that the copyright transfer here was valid and effective.

Moreover, while AcademyOne urges us to find that no valid transfer occurred because the valuation of CGF's assets (which is the amount CGF declared as donated assets on the Form 990, and the amount CollegeSource paid SDF for the assets) did not include the copyrights, it has cited no authority that would support a conclusion that actual value must be paid for a copyright in order to effectuate a valid transfer. Contra Davis v. Blige, 419 F. Supp. 2d 493, 501 n.5 (S.D.N.Y. 2005) ("[I]t appears that no consideration is required under federal law to effectuate a copyright transfer, unless such consideration is required by the transaction itself." (citing Melvin Nimmer & David Nimmer, 3 Nimmer on Copyright § 10.03)), vacated on other grounds, 505 F.3d 90 (2d Cir. 2007)). Thus, we find that the extrinsic evidence that AcademyOne proffers does not render the unambiguous contract language reasonably susceptible to the meaning AcademyOne seeks to ascribe to it.

In sum, where, as here, the Donor Agreement transferred to SDF "any and all of the properties and assets of [CGF], both real and personal, tangible and intangible, of every kind and nature," the accompanying Purchase Agreement clearly states that SDF sold everything it received from CGF, including copyrights, to CollegeSource, and the signatories to the Agreement have submitted sworn declarations that the parties intended to transfer the copyrights, we cannot conclude that the tangential evidence on which AcademyOne relies renders the two Agreements susceptible to an interpretation that no copyrights were transferred. (Anders Decl. Exs. A and B.) Accordingly, we find that there is no genuine issue of material fact as to the intent of the parties to the copyright transfer and no question as to the legal effect of the transfer documents. Consequently, AcademyOne has not and cannot establish that CollegeSource falsely advertised that it held copyrights to the course catalog materials. We therefore enter judgment in CollegeSource's favor on AcademyOne's

false advertising claim.[5]

**B**. **Trademark Infringement**

Count Two of the Complaint asserts that CollegeSource infringed upon AcademyOne's trademark in www.collegetransfer.net, when it registered and began using the domain name www.collegetransfer.com. CollegeSource argues that we should grant summary judgment in its favor on this claim, because the undisputed facts in the summary judgment record demonstrate that collegetransfer.net is not a protectable trademark. AcademyOne maintains, however, that there are genuine issues of material fact as to whether collegetransfer.net is protectable. For the following reasons, we find that AcademyOne has not marshaled sufficient evidence from which a factfinder could conclude that collegetransfer.net was a protectable trademark as of the date of CollegeSource's alleged infringement, and we therefore enter judgment in CollegeSource's favor on the trademark infringement claim.[6]

The cause of action for trademark infringement under the Lanham Act is set forth in § 43(a),

_____

[5]CollegeSource also argues that, as a matter of law, statements regarding the ownership of intellectual property are not actionable as false advertising under § 43(a). (CollegeSource Compr. Br. at 7 (citing, e.g., Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23 (2003); Pernod Ricardo USA LLC v. Bacardi U.S.A., Inc., 505 F. Supp.2d 245 (D. Del. 2007); Monsanto Co. v. Syngenta Seeds, Inc., 443 F. Supp. 2d 648 (D. Del. 2006)). The law on this issue, however, is not as clear as CollegeSource paints it to be. See, e.g., 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 27:78 (4th ed. 2009) ("McCarthy on Trademarks") ("While it has been held that a false claim that defendant's product is patented or copyrighted is actionable under 43(a), the Second Circuit has held that § 43(a) does not cover allegations that defendants falsely claimed to have certain trademark rights or a federal registration of its mark." (emphasis added)). In any event, we need not reach this legal issue as we enter judgment in CollegeSource's favor on the false advertising claim based on AcademyOne's failure to identify record evidence that could conceivably support a finding that CollegeSource's representations regarding its copyright ownership were false.

[6]Collegetransfer.net is not a registered trademark. AcademyOne did not file an application to register the term with the United States Patent and Trademark Office ("USPTO") until July 3, 2009.

which provides in pertinent part as follows:

> (1)    Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or devise, or any combination thereof, . . . which –
>
> (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods [or] services . . . by another person,
>
> \*   \*   \*
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  The United States Court of Appeals for the Third Circuit has stated that a plaintiff who seeks to establish trademark infringement under these provisions must prove (1) the existence of a  valid and legally protectable trademark, (2) that it owns the mark, and (3) that the defendant's use of the mark to identify goods or services is likely to create confusion.  Checkpoint Sys., Inc. v. Checkpoint Software Techs., Inc., 269 F.3d 270, 279 (3d Cir. 2001) (citation omitted); A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000) (citations omitted).  The plaintiff bears the burden of proof.  A & H Sportswear, 237 F.3d at 210-11 (citing Am. Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 371 (3d Cir. 1987)).

Whether an alleged trademark is actually a valid and legally protectable trademark is tied to the term's distinctiveness.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992).  A term cannot be a trademark unless it is distinctive, i.e., "capable of distinguishing the applicant's goods from those of others" and also capable of indicating the source of the goods.  Id.; see also 15 U.S.C. § 1127 (defining "trademark" as any word, name or symbol used by a person "to identify and

distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods . . . .").  To assess the distinctiveness of a term, a court must assign the term to one of four categories:

> [1] arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods; [2] suggestive terms, which suggest rather than describe the characteristics of goods; [3] descriptive terms, which describe a characteristic or ingredient of the article to which it refers[;] and [4] generic terms, which function as the common descriptive name of a product class.

E.T. Browne Drug Co. v. Cococare Prods., Inc., 538 F.3d 185, 191 (3d Cir. 2008) (quoting A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d Cir. 1986)).  The Lanham Act provides no protection for generic terms, which have no distinctiveness, because they merely "refe[r] to the genus of which the particular product is a species."  Two Pesos, 505 U.S. at 768; E.T. Browne, 538 F.3d at 191 ("[A] first-user of a term 'cannot deprive competing manufacturers of the product of the right to call an article by its name.'" (quoting Canfield, 808 F.2d at 297)).  On the other hand, the Act "protects descriptive terms if they have acquired secondary meaning associating the term with the claimant," E.T. Browne, 538 F.3d at 191 (citations omitted), because such terms have, in essence, acquired distinctiveness on account of their secondary meaning.  Two Pesos, 505 U.S. at 768.  Likewise, the Act protects "suggestive" and "arbitrary or fanciful" terms, because they are inherently distinctive and, thus, there is no requirement that the plaintiff show any secondary meaning for such terms to be protected.  E.T. Browne, 538 F.3d at 191 (citing Berner Int'l Corp. v. Mars Sales Co., 987 F.2d 975, 979 (3d Cir. 1993)); Two Pesos, 505 U.S. at 768.

A term is descriptive "if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods," Canfield, 808 F.2d at 297, thereby "directly giv[ing] some

reasonably accurate or tolerably distinct knowledge of the characteristics of a product [or service]."

2 McCarthy on Trademarks § 11:19 at 35.   In contrast, a term is suggestive "[i]f information about the product or service given by the term . . . is indirect or vague."  Id.  The "descriptive-suggestive borderline is hardly a clear one."  Id. § 11:66.  However, the most popular test for determining whether a term is suggestive or descriptive is the "imagination test," which asks whether a term "'requires imagination, thought or perception to reach a conclusion as to the nature of'" a product. Id. (quoting Stix Products, Inc. v. United Merchants & Mfrs., Inc., 295 F. Supp. 479, 488 (S.D.N.Y. 1968)); Canfield, 808 F.2d at 297 (Stix "correctly stated the distinction between suggestive and descriptive terms").

Here, CollegeSource argues that the undisputed facts in the summary judgment record demonstrate that collegetransfer.net is either a generic term for the products/services that AcademyOne offers or a descriptive term that had not acquired the requisite secondary meaning as of the date that CollegeSource began using www.collegetransfer.com.  AcademyOne, however, maintains that the summary judgment record creates a genuine issue as to whether collegetransfer.net is either (1) a term that is merely suggestive of AcademyOne's products and services, or (2) a descriptive term that had acquired the requisite secondary meaning.  For the following reasons, we find that AcademyOne has failed to "set forth specific facts showing that there is a genuine issue for trial,"  Fed. R. Civ. P. 56(e)(2), as it has failed to make a factual showing sufficient to create a genuine issue of material fact as to whether collegetransfer.net is a protectable trademark.  More specifically, AcademyOne has failed to point to evidence that creates a genuine issue of material fact as to whether collegetransfer.net is either suggestive or had a secondary meaning as of October 8,

2007, when CollegeSource launched www.collegetransfer.com.[7]

### 1. Suggestiveness

As explained above, the distinction between suggestive and descriptive terms is as follows:

> A term is suggestive if it requires imagination, thought or perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

A.J. Canfield, 808 F.2d at 297 (quoting Stix, 295 F. Supp. at 488). AcademyOne maintains that collegetransfer.net is suggestive because "collegetransfer" is "outside the common vernacular" and is an "incongruous word combination." (AcademyOne Compr. Br. at 51.) With this as its premise, AcademyOne argues that a consumer encountering the name "collegetransfer.net"

> must take a "mental pause" and go through the following steps: (1) a college does not, and cannot, "transfer;" (2) [t]hings associated with a college such as faculty, staff, students, classes, class credits, library and research materials, or computer files and data are capable of being "transferred;" (3) this website must want consumers to know that it provides services related to transferring people or things that are somehow associated with a college.

(Id. at 49.) It further argues that the consumer, even after ascertaining the basic nature of the website, cannot discern the actual nature of the services the website provides.

However, the record evidence clearly establishes that the phrase "college transfer" is much more recognizable than AcademyOne suggests.[8] Indeed, AcademyOne has itself liberally used the

---

[7]Because AcademyOne has not pointed to evidence that could support a finding that it held a protectable trademark in collegetransfer.net as of October 8, 2007, we need not reach CollegeSource's argument that collegetransfer.net is also not protectable because it is generic.

[8]AcademyOne urges us to consider "collegetransfer" as distinct from "college [space] transfer" and, thus, more prone to misinterpretation. However, given that domain names never have spaces between otherwise distinct words, this argument is simply unpersuasive. See generally TCPIP Holding Co., Inc. v. Haar Commc'ns, Inc., 244 F.3d 88, 101 (2d Cir. 2001) (noting that it is

-18-

phrase "college transfer" to describe the services that it offers.  (See, e.g., Moldoff Decl. Ex. H at ACA-PA00000941 (AcademyOne Brochure stating that "AcademyOne is an innovative technology and services company providing college transfer solutions"); Karetnick Decl. Ex. NN (www.collegetransfer.net home page describing website as "[t]he leading college transfer portal" and urging students to use AcademyOne's services to "prepare for college transfer proactively"); Sullivan Decl. Ex. F (Google Advertisement for www.collegetransfer.net using the phrase "College Transfer Help").)[9]  Similarly, when conducting interviews in this case, AcademyOne's own expert, Warren J. Keegan, told interviewees that he was conducting a survey on the "college transfer process" and asked whether the interviewees were "satisfied with the college transfer tools" that were available.  (See Quinn Suppl. Decl. Ex. C at K-PA000001 and K-PA000004.)  Furthermore, AcademyOne alleged in its Complaint that it chose the domain name collegetransfer.net "to correspond with the nature of its products" and described its business as "improving the efficiency and reducing the cost of the college transfer process for both students and educational institutions." (Compl. ¶¶ 6, 68.)  While there is no dictionary definition for the phrase "college transfer" in the

---

of "little or no significance" that "separate words are run together without separating spaces or punctuation" in a domain name, explaining that "consumers would see the domain name 'thechildrensplace.com/.net' as employing functionally the same name as 'The Children's Place'"); RDK Corp. v. Larsen Bakery, Inc., Civ. A. No. 02-C-0675, 2006 WL 2168797, *19 (E.D. Wis. July 31, 2006) (stating that the "[d]ifference[] of the separate words running together . . . ha[s] little to no significance regarding the trademark infringement of internet addresses, as an internet address requires elimination of spaces . . .").

[9]AcademyOne has filed a Daubert motion, seeking to exclude from evidence both Sullivan's expert opinions and the opinions of a second expert, David C. Hilliard.  As we have not yet ruled on that motion, we have not considered any of Sullivan's or Hilliard's expert opinions in deciding CollegeSource's Summary Judgment Motion.  That said, there is no impediment to considering AcademyOne's advertisement that is attached to Sullivan's Declaration, because AcademyOne "does not dispute the text in its advertisement on Google."  (Resp. to SSMF ¶ 109.)

summary judgment record, there is evidence that at least one accepted dictionary definition for the word "transfer" is "to withdraw from one school, college, or the like, and enter another." (Quinn Decl. Ex. G at 1.) Given this definition, it seems plain that the addition of "college" before the word "transfer" does not, as AcademyOne suggests, create an "incongruous word combination," but merely clarifies the type of transfer that is being referenced, leaving nothing to the imagination.

Notably, AcademyOne cites no record evidence that could potentially support its assertion that there is no commonly understood meaning for the phrase "college transfer," e.g., evidence that the phrase "college transfer" is used to refer to things other than transfer from one educational institution to another or evidence that individuals are genuinely confused as to the meaning of "collegetransfer." Instead, it simply argues that imagination is required to understand that collegetransfer.net pertains to college transfers and then further asserts that the term is suggestive because a consumer encountering the domain name would not know the actual nature of the services that the website provides. This second argument is difficult to address as AcademyOne itself has never clearly articulated the precise services that its website offers.[10] Nevertheless, what is crystal

---

[10]On the one hand, AcademyOne asserts that the services that collegetransfer.net provides are "transfer articulation" services, which are services related to the "'process of matching curriculum from your institution's catalog to incoming courses on transcripts for the purpose of establishing what kind of credit and how much credit you're going to award students as they enter your college.'" (AcademyOne Compr. Br. at 46 (quoting Holaday Dep. at 11-12.)) On the other hand, it alternatively asserts that collegetransfer.net provides a much broader "clearinghouse of services" for undergraduate institutions and students. (AcademyOne Compr. Br. at 47; see also AcademyOne's Opp. to CollegeSource's Mot. for Summ. Judg. (Docket No. 66) at 3 (describing the website as "an authoritative repository for college transfer information").) It describes the services as not only concerning the transferability of college credits, but as also including informational services "regarding the general process of changing undergraduate institutions" and a forum in which to "share documents, general information, or personal thoughts and questions with, and receive comments and constructive feedback from, friends, mentors, or advisors." (AcademyOne Compr. Br. at 47.) Meanwhile, upon questioning at oral argument, AcademyOne acknowledged that when

clear from the record is that collegetransfer.net offers services to students transferring from one academic institution to another and to academic institutions that accept transfer students, and that the services concern the college transfer process. Given that fact, it simply defies all logic to say that the domain name collegetransfer.net does not "forthwith convey[] an immediate idea" regarding, or "give some reasonably accurate or tolerably distinct knowledge of the characteristics of," the services that are offered through collegetransfer.net. A.J. Canfield, 808 F.2d at 297; 2 McCarthy on Trademarks § 11:19 at 35 (citations omitted).

We therefore find that AcademyOne has failed to meet its burden of pointing to record evidence that would create a genuine issue of material fact as to whether collegetransfer.net is suggestive. See Fed. R. Civ. P. 56(e)(2). To the contrary, the undisputed record evidence establishes that collegetransfer.net is not suggestive and, as such, is not automatically deserving of trademark protection.

## 2. Secondary Meaning

Our conclusion that AcademyOne has not marshaled evidence from which a factfinder could find suggestiveness does not end our trademark inquiry, because AcademyOne argues in the alternative that collegetransfer.net is descriptive and that there are genuine issues of material fact as to whether, as of October 8, 2007 (the date of CollegeSource's alleged infringement), the alleged

---

it applied to register its trademark with the USPTO, it stated that the services associated with collegetransfer.net are: College consulting services, namely, assisting students in finding colleges and universities and completing the application process; Educational course monitoring, namely, tracking student performance; Providing a web site that features information on attending college and university with an emphasis on newly enrolled students. (See N.T. 11/5/09 at 37-38.) It admitted during the argument that this was an accurate description of the services provided, which, in its view, included transfer articulation services. (Id. at 39, 41-42.)

mark had acquired a secondary meaning.

In order to establish "secondary meaning," a plaintiff must show that "customers associate [the alleged trademark] with a single, albeit anonymous, commercial source."  2 McCarthy on Trademarks § 15:1 at 6.  As the Third Circuit has explained:

> "Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source. Once a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark. The purpose of this rule is to minimize confusion of the public as to the origin of the product and to avoid diversion of customers misled by a similar mark."

E.T. Browne, 538 F.3d at 199 (quoting Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978)).  Given that competitors can only be prohibited from using a descriptive term once it achieves secondary meaning, a plaintiff in a trademark infringement case "must establish secondary meaning . . . at the time and place that the defendant began use of the [alleged] mark." Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000) (emphasis added)  (citing Scott Paper Co., 589 F.2d at 1231, and J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:4 (4th ed. 1997)));  see also Ride the Ducks, L.L.C. v. Duck Boat Tours, Inc., 75 U.S.P.Q.2d 1269, 1274 (E.D. Pa. 2005) (same) (citations omitted).  To determine whether a descriptive term has acquired the requisite secondary meaning, a court may consider the following factors:

> (1) extent of sales and advertising leading to buyer association;
> (2) length of use;

(3) exclusivity of use;
(4) the fact of copying;
(5) customer surveys;
(6) customer testimony;
(7) the use of the mark in trade journals;
(8) the size of the company,
(9) the number of sales;
(10) the number of customers; and
(11) actual confusion.

See Commerce Nat. Ins. Servs., 214 F.3d at 438 (citation omitted).

In this case, it is undisputed that the length of exclusive use of the collegetransfer.net prior to CollegeSource's alleged infringement was a mere seven months (March 2007-October 2007). (See AcademyOne Compr. Br. at 57; SSMF ¶¶ 127-28; Resp. to SSMF ¶¶ 127-28.) As this is not much time for an alleged trademark to acquire a secondary meaning,[11] AcademyOne argues that internet businesses "obtain recognition" at an "accelerated pace." (AcademyOne Compr. Br. at 57.) To establish that collegetransfer.net acquired a secondary meaning at such an accelerated pace, AcademyOne relies on several of the other factors in the multi-factor test.

First, AcademyOne points to evidence that, from January 2007 through December 2007, it engaged in marketing activities, including the purchase of Google, Microsoft and Yahoo adwords,[12] attendance at conferences, and issuance of press releases, and spent significant sums on marketing, employee and consultant salaries, and promotional travel. (See Moldoff Decl. ¶¶ 25-39 and Ex. F.)

---

[11]See, e.g., Ride the Ducks, 75 U.S.P.Q.2d at 1276 (stating that eleven months of use and/or promotion was "not a sufficient amount of time to establish secondary meaning"),

[12]According to David Moldoff, AcademyOne's CEO, "[a]dwords are keywords that, as a marketer one bids on so that when an Internet user searches for that word, one's website is listed in a 'Sponsored Link' column either at the top or side of the screen, separate from the search words." (Moldoff Decl. ¶ 26.)

However, the record does not reveal how much of this advertising and marketing preceded October 8, 2007, much less how much of it was actually specific to collegetransfer.net, such that it was likely to lead to buyer association between collegetransfer.net and the services that it provides. For example, although there is evidence that AcademyOne purchased internet adwords prior to October 8, 2007, the record is not clear as to the dollar amount of the purchases that preceded October 8, 2007, and does not reveal how many of the purchased adwords actually directed users to collegetransfer.net as opposed to AcademyOne's other websites, academyone.com and courseatlas.com.[13] (<u>See</u> Moldoff Decl. ¶ 26 (stating generically that "AcademyOne has spent significant sums on . . . adwords to promote <u>its products and services</u>" (emphasis added).)

AcademyOne also points to a collection of brochures that promoted collegetransfer.net but, again, it fails to proffer any evidence that these brochures were actually in existence, much less distributed, prior to October 8, 2007.[14] (Moldoff Decl. Exs. G and H.) Similarly, AcademyOne has produced evidence that, sometime in 2007, it "attend[ed] conferences held by, or became members of," eight educational state agencies and associations (Moldoff Decl. ¶ 36), but it does not identify any specific conference that it attended, or association that it joined, <u>prior to October 8, 2007.</u>[15]

---

[13]At oral argument, counsel for AcademyOne acknowledged that the advertising monies covered all of AcademyOne's websites. (N.T. 11/5/09 at 44.) While counsel argued that promotion of academyone.com promotes collegetransfer.net, because "if you go to Academyone, Collegetransfer.net is on there," we do not find factual support in the summary judgment record for the assertion that, between March and October of 2007, the Academyone.com website promoted collegetransfer.net. (<u>Id.</u> at 44-45.)

[14]Indeed, one of the included brochures actually has a 2008 copyright. (Ex. H to Moldoff Decl. at ACA-PA00000564.)

[15]There is also no evidence from which a factfinder could draw an inference that AcademyOne's mere membership in an association generated consumer interest in

Likewise, neither of the two 2007 press releases in the record, one dated January 16, 2007 and one dated February 1, 2007, explicitly promote collegetransfer.net and, rather, merely mention the website in a short paragraph at the end of the release, entitled "About AcademyOne."[16] (Moldoff Decl Ex. I); see Platinum Home Mortg. Corp. v. Platinum Financial Group, Inc., 149 F.3d 722, 729 (7th Cir. 1998) ("Evidence of advertising and sales is entirely circumstantial, and that evidence does not necessarily indicate that consumers associate a mark with a particular source, particularly when the advertisements and promotions do not specifically emphasize the mark").

The only clear evidence of marketing activity for collegetransfer.net during the relevant time period is a set of screenshots for an April 11, 2007 webcast; however, the record does not identify any of the participants in that webcast. (Moldoff Decl. Ex. L.) We therefore conclude that the very limited record evidence of AcademyOne's advertising and promotion of collegetransfer.net does not provide support for a reasonable inference that collegetransfer.net had gained a secondary meaning in the minds of the relevant public as of October 8, 2007.

AcademyOne nevertheless argues that its evidence of marketing and advertising, in conjunction with evidence regarding the size of the company, the number of sales, and the number of customers, gives rise to a reasonable inference of secondary meaning as of October 8, 2007. See

_____

collegetransfer.net.
     AcademyOne emphasizes that it attended, and was a sponsor for, the 2007 annual conference of the State Higher Education Executive Organization, "whose [members'] designees have direct oversight over the transfer programs at their institutions," and that Moldoff spoke and distributed "some literature about AcademyOne and www.collegetransfer.net" at that conference. (Moldoff Decl. ¶¶ 37-38.) Again, however, the record does not disclose whether that conference was before or after October 8, 2007.

     [16]There is also no record evidence that either of these press releases were picked up by any publications.

E.T. Browne, 538 F.3d at 199-200 (stating that a plaintiff might establish secondary meaning through evidence of advertising in combination with sales growth (citing Commerce Nat. Ins. Servs., 214 F.3d at 438)). AcademyOne points to evidence that it had revenues of $805,698 in 2007, that "the web applications at www.collegetransfer.net" received 52,885 visitors in 2007, and that it had fourteen academic institutions and state higher education agencies as subscribers to collegetransfer.net as of July of 2009.[17] (Moldoff Decl. ¶¶ 22-23 and Ex. D.) Again, however, the record evidence does not show how much of the revenues were generated, how many of the visits occurred, and how many collegetransfer.net subscribers it had prior to October 8, 2007. In addition, while AcademyOne's 2007 revenues are significant, there is no record evidence that the revenues were from sales of subscriptions to collegetransfer.net or even generated by consumer awareness of collegetransfer.net. Indeed, the record evidence is that AcademyOne offered and sold products and services prior to its launch of collegetransfer.net, which no doubt generated revenue.[18] In sum, AcademyOne has failed to meet its burden of pointing to any record evidence from which a factfinder could find or reasonably infer that AcademyOne had any subscribers to collegetransfer.net prior to October 8, 2007, or that its 2007 revenues and company size were in any way connected to

---

[17]AcademyOne also submits evidence that its revenues increased to $1,119,736 in 2008 and to $1,654,525 in the first half of 2009, and that the visitors to "the web applications at www.collegetransfer.net" grew to 70,015 in 2008, and to 50,006 in the first half of 2009. (Moldoff Decl. ¶ 23.) However, there is simply no basis in this record for a factfinder to determine or even reasonably infer what, if any, of this growth resulted from consumer awareness of collegetransfer.net prior to October 8, 2007.

[18]The record evidence shows that, before the launch of collegetransfer.net and courseatlas.com in May of 2007, AcademyOne had contracts to provide services to the Indiana Commission for Higher Education and the Pennsylvania Department of Education. (See Moldoff Decl. Ex. N. at ACA-PA00000557.)

consumer recognition of that newly launched website. As such, there is no record evidence that would support a reasonable inference that AcademyOne's pre-October 8, 2007 advertising had resulted in increased revenues from, and/or sales of, the services offered through collegetransfer.net by that date.

AcademyOne has also not submitted any formal survey evidence designed to demonstrate consumer awareness of collegetransfer.net. It has instead submitted an August 14, 2009 expert "marketing" report by Dr. Warren J. Keegan.[19] (Quinn Suppl. Decl. Ex. B.) That report states that AcademyOne's "marketing mix" has been successful in generating awareness of its product, and that AcademyOne "has built considerable awareness of the CollegeTransfer.net brand among its target market before and since its launch in April 2007." (Id. at 6, 10.) As such, although the Keegan Report is supportive of a finding that, in 2009, more than two years after the website's launch, AcademyOne has succeeded in obtaining some level of recognition for collegetransfer.net, it does not provide any meaningful support for the assertion that consumers were aware of the alleged mark and its association with a single seller in early October, 2007.[20]

A post-infringement survey may inferentially support secondary meaning. See General Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 419 (6th Cir. 2006) (considering whether to "ignore all survey evidence conducted post-infringement or accept the evidence with the

---

[19]Curiously, AcademyOne did not submit a full copy of Dr. Keegan's report to the Court, opting instead to include a copy of the report that did not include the appended exhibits. (See AcademyOne Compr. Br. Ex. 7.)

[20]AcademyOne's counsel stated at oral argument that the record included one individual's testimony that she knew of collegetransfer.net as of October 8, 2007, but when pressed for a record cite, counsel was unable to point to any such testimony. (N.T. 11/5/09, at 23-25.)

understanding that the survey does not reflect a pre-infringement world," and concluding that "[a]

court may easily take into consideration the strength of recognition at the time of the survey in light

of the amount of time passed between that date and the date of infringement"). However, the Keegan

Report, on its face, is simply not the type of survey evidence that could possibly support such an

inference. See generally id. at 418-19 (involving two surveys, one of 228 respondents, 96% of whom

could correctly identify the product at issue, and another survey showing that 88% of respondents

were aware that the product came from a single source). The summary judgment record reflects that,

in preparing his report, Dr. Keegan conducted "exploratory interviews" of just four individuals. (See

Quinn Suppl. Decl. Ex. B, at Ex. 4.) All four individuals "recognized the internet address

www.collegetransfer.net and were aware that it was sponsored by AcademyOne or thought that it

might be sponsored by AcademyOne" and "recognized AcademyOne as an innovator and as a leader

in developing proactive tools for students, faculty, and administrators that aid in the college transfer

process." (Id. at 9-10.) However, the fact that four select individuals in the industry were aware of

collegetransfer.net in August of 2009, is simply not probative of whether collegetransfer.net had any

level of recognition in October of 2007, a mere seven months after its launch.[21] Accordingly, the

Keegan Report does not even provide inferential support for AcademyOne's assertion of secondary

meaning in October of 2007.

AcademyOne also argues that the requisite secondary meaning in its mark is evidenced by

_____

[21]CollegeSource has filed a Daubert motion, seeking to exclude Dr. Keegan's testimony and
survey from evidence for a variety of reasons, including that his survey of a handful of handpicked
individuals lacks reliability. In granting summary judgment in CollegeSource's favor, we fully
consider Dr. Keegan's opinions, without deciding the admissibility issues raised in CollegeSource's
Daubert motion.

the fact that, prior to October 8, 2007, "Collegetransfer.net has . . . been referred to and promoted in publications and had been sought after as a resource by a national television station – MTV." (AcademyOne Compr. Br. at 61-62.)  However, the March 2007 publication that it cites only references www.academyone.com and "a web-accessible National Course Atlas," not collegetransfer.net.  (Moldoff Decl. Ex. N at ACA-PA00000548-550.)  Likewise, the January 15, 2007 publication never mentions collegetransfer.net.  (Id. at ACA-PA00000557.)  Moreover, the August 2007 email that it cites as evidence that MTV sought out collegetransfer.net as a resource merely states that Moldoff was approached by MTV "to find students contemplating transfer to promote their casting call." (Moldoff Decl. Ex. O.)  It therefore provides no basis on which a factfinder could conclude or even reasonably infer that MTV was aware of collegetransfer.net, as opposed to simply AcademyOne.  In fact, the record contains no evidence of any reference to collegetransfer.net in any independent publication, or any other public recognition of the website/alleged trademark, prior to October 8, 2007.

AcademyOne also argues that the "fact of copying" is evidence of secondary meaning in this case.  It points to record evidence that CollegeSource was aware of AcademyOne as early as November of 2005, and that CollegeSource became aware of collegetransfer.net in the course of a dispute between the parties concerning AcademyOne's alleged use of CollegeSource's proprietary course catalog materials on its websites.  (Moldoff Decl. ¶ 44 and Ex. Q.)  It also points to record evidence that, in July 2007, CollegeSource purchased the domain name collegetransfer.com for $6,500.00, using an alias, and that it began using that web address to link to its primary web address, collegesource.com, on October 8, 2007.  (Karetnick Decl. Ex. X.)

AcademyOne relies largely on Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc., 695 F.

Supp. 787 (D.N.J. 1988), in which the district court found that the defendant's express instruction to copy plaintiff's packaging, which plaintiff had used for thirty years, was alone sufficient to establish secondary meaning in trade dress case. Id. at 792 (citations omitted). However, there is ample and more persuasive authority supporting the contrary position, i.e., that intentional copying alone is not sufficient to prove a secondary meaning. See, e.g., General Motors, 468 F.3d at 419 ("Intentional copying . . . is only one of many considerations in the [multi]-factor test and does not alone establish secondary meaning."); Good 'N Natural v. Nature's Bounty, Inc., Civ. A. No. 87-662, 1990 WL 127126, at *12 (D.N.J. Aug. 30, 1990) ("[T]he better rule is that evidence of intentional copying may be corroborative of other circumstantial evidence of secondary meaning, but is insufficient by itself to establish that meaning.") (citations omitted); A.J. Canfield Co. v. Concord Beverage Co., 629 F. Supp. 200, 212 (E.D. Pa. 1985) ("[I]ntentional copying is not a substitute for secondary meaning under § 43(a)") (citations omitted), judgment aff'd on other grounds, 808 F.2d 291 (3d Cir. 1986). As the Good 'N Natural court clearly explained:

> Section 43(a) of the Lanham Act was enacted to prevent confusion in the marketplace as to the source of goods and unfair use of a mark associated with a particular producer. Scott Paper Co., 589 F.2d at 1228. In the absence of consumer identification of a descriptive mark with a particular producer, i.e., secondary meaning, the mere copying of the mark cannot create actual confusion or misrepresentation as to the source of the product on which it is affixed-there is no consumer association to exploit. Moreover, absent secondary meaning, a producer does not have a valid trademark in a merely descriptive mark. Copying by a competitor of a mark that is in the public domain does not somehow confer rights to the mark in an existing user, and hence substitute for secondary meaning. As the Seventh Circuit observed, an infringer's intent to copy "is more relevant to deciding whether consumers are likely to be confused than whether the trademark is valid; if the infringer thinks they will be confused that is some evidence they will be. That question does not arise unless the trademark is valid. . . ." [Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,

781 F.2d 604, 611 (7th Cir. 1986)] (citation omitted).

Good 'N Natural, 1990 WL 127126, at *12.

Indeed, as we understand the "fact of copying" factor in the context of the secondary meaning analysis, it is, like the other factors, designed to be an indicator of overall consumer awareness of the alleged trademark. Commerce Nat. Ins. Servs., 214 F.3d at 438 (setting forth list of factors to be considered in determining whether the alleged mark "'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services'" (quoting Scott Paper Co., 589 F.2d at at 1228) (emphasis added)). Here, the record evidence of copying simply does not give rise to a reasonable inference that collegetransfer.net was, at the time of the alleged copying, already an established and recognizable trademark. The evidence on which AcademyOne relies is that CollegeSource learned of collegetransfer.net, not through regular consumer channels, but because of a dispute it had with AcademyOne regarding AcademyOne's alleged use of CollegeSource's proprietary property. Furthermore, Troy Holaday, the president of CollegeSource, testified that he chose the internet address collegetransfer.com "because College Transfer is a descriptive name for the business – of the kind of business [CollegeSource is] in," not in order to take advantage of existing consumer association of collegetransfer.net with the types of services that both AcademyOne and CollegeSource offered. (Holaday Dep. at 8, 41; see also Compl. ¶ 6 (alleging that AcademyOne chose the name collegetransfer.net "to correspond with the nature of its products")).

Accordingly, we find that even if AcademyOne has succeeded in establishing a genuine issue of fact as to whether CollegeSource intended to copy collegetransfer.net when it registered collegetransfer.com, CollegeSource's intent to copy, standing alone, is not sufficient to establish

secondary meaning under the circumstances presented here, i.e., where neither the copying itself nor anything else in the record can give rise to a reasonable inference that there was <u>consumer recognition</u> of collegetransfer.net as of October 8, 2007.  <u>See</u> <u>Good 'N Natural</u>, 1990 WL 127126, at *13 ("The absence of any other genuine disputed facts as to secondary meaning . . . renders the copying issue immaterial.")

In sum, AcademyOne has failed to satisfy its summary judgment burden of pointing to record evidence that creates a genuine issue of material fact as to collegetransfer.net's secondary meaning as of October 8, 2007.  As the court stated in <u>Componentone, L.L.C. v. Componentart, Inc.</u>, Civ. A. No. 05-1122, 2008 WL 4790661  (W.D. Pa. Oct. 27, 2008):

> [T]he absence of any direct evidence of [the] mark's alleged secondary meaning is telling. While the evidence of advertising and sales figures conclusively demonstrates that [Plaintiff] "hoped the term would acquire secondary meaning, nothing shows that it achieved this goal. Jurors would have to make a leap of faith to conclude that the term gained secondary meaning because the record fails to provide sufficient support."

<u>Id.</u> at *12 (quoting <u>E.T. Browne</u>, 538 F.3d at 199) (additional citations omitted).   In this case, as in <u>Componentone</u>, the factfinder would have to make a "leap of faith" to reach the conclusion that the alleged trademark had obtained a secondary meaning as of October 8, 2007.   Indeed, in spite of the voluminous record, there is simply nothing of substance on which a factfinder could base a finding of secondary meaning as of October 8, 2007.  As the existing summary judgment record cannot support a reasonable conclusion that collegetransfer.net was a protectable trademark as of October 8, 2007, we enter judgment in CollegeSource's favor on AcademyOne's trademark infringement claim.

**C**. **Cybersquatting**

Count III of the Complaint asserts that CollegeSource is liable for cybersquatting under the ACPA, based on its allegedly bad faith registration of www.collegetransfer.com in conjunction with the launching of a product in competition with AcademyOne's. CollegeSource moves for summary judgment on this claim, arguing that a cybersquatting claim, like a trademark infringement claim, fails in the absence of a valid and protectable trademark. We agree.

The ACPA provides in pertinent part that:

> (1)(A) A person shall be liable in a civil action <u>by the owner of a mark</u> . . . if, without regard to the goods or services of the parties, that person
>
> (I) has a bad faith intent to profit from that mark . . . ; and
>
> (ii) registers, traffics in, or uses a domain name that--
>
>> (I) in the case of a mark that is distinctive <u>at the time of registration of the domain name</u>, is identical or confusingly similar to that mark; [or]
>>
>> (II) in the case of a famous mark that is famous <u>at the time of registration of the domain name,</u> is identical or confusingly similar to or dilutive of that mark . . . .

15 U.S.C. § 1125(d) (emphasis added). A "mark" is defined in 15 U.S.C. § 1127 to include "any trademark, service mark, collective mark or certification mark." Kane on Trademark Law specifically states that "Cybersquatting or cyberpiracy refers to the bad-faith practice of registering as a domain name or as part of a domain name <u>a trademark</u> that belongs to someone else." Siegrun D. Kane, Kane on Trademark Law § 11:1:2 (5th ed. 2009) (emphasis added). Likewise, the Third Circuit stated in <u>Shields v. Zuccarini</u>, 254 F.3d 476 (3d Cir. 2001), that the ACPA "was intended to prevent 'cybersquatting,' an expression that has come to mean the bad faith, abusive registration and

use of the distinctive <u>trademarks</u> of others as Internet domain names.'" <u>Id.</u> at 481.  Finally, the Fourth Circuit has explicitly stated that "a prerequisite for bringing an action under the ACPA is establishing the existence of a valid trademark." <u>Retail Servs. Inc. v. Freebies Publ'g</u>, 364 F.3d 535, 549 (4th Cir. 2004); <u>see</u> <u>also</u> <u>Coca-Cola Co. v. Purdy,</u> 382 F.3d 774, 778 (8th Cir. 2004) ("The development of the Internet created new areas of concern, and in 1999 Congress passed the [ACPA] in order to prevent misappropriation <u>of trademarks</u> by stopping conduct known as 'cybersquatting.'") (emphasis added); <u>DaimlerChrysler v. The Net Inc.,</u> 388 F.3d 201, 204 (6th Cir. 2004) ("'[C]ybersquatting' occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder") (citation omitted).

In sum, because only a trademark, which is entitled to protection under the Lanham Act and that exists at the time of the registration of the allegedly offending domain name, can give rise to a cause of action for cybersquatting, and we have found that AcademyOne has failed to satisfy its burden of creating a genuine issue of material fact as to whether collegetransfer.net was a protectable trademark as of October 8, 2007, we grant summary judgment in favor of CollegeSource on AcademyOne's cybersquatting claim.

## IV. CONCLUSION

For the foregoing reasons, we grant CollegeSource's Summary Judgment Motion in its entirety, and enter judgment in CollegeSource's favor. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.
_____
John R. Padova, J.